Kemp v. Fulton County. Mr. LaFontaine? Yes, Your Honor. You may proceed. Thank you, Your Honor. May it please the Court. My name is James LaFontaine. I'm the attorney for the appellant Greg Kemp. We are here appealing a granting of summary judgment on December 16, 2020 by the District Court in favor of the defendants. The issue before the Court is whether or not there were genuine issues of material fact which preclude summary judgment. Now, our test for objective reasonableness still involves asking whether an officer's ability to protect an inmate was obvious. Given the lack of history between Kemp and the other inmates involved, can the potential for harm really have been obvious to the defendants? Your Honor, I believe the answer to that is yes, and that is because obviously hearing is super important. If you are going to put a corrections officer in charge of the inmates, if you put an officer who has impaired hearing in charge, I think an objective person would be able to appreciate the great risk that that would put any inmate in, regardless of whether or not they had a specific allegation or specific information regarding one inmate's propensity to hurt another inmate. So, Mr. LaFontaine, is there any evidence in this record of any other times that Officer Berger's hearing was a problem? I found it all somewhat vague. I couldn't tell how much assistance he got from the hearing aid. For some people, hearing aids are a miraculous help, and for other people, they don't address the underlying problem at all. So, there's a real range, and I was disturbed because there does seem to be evidence that other people in the jail that night, such as Officer Williams, didn't hear Kemp shouting out, even though you've emphasized in your questions. There was evidence in the medical records that Officer Berger's hearing affected his ability to work, number one. Are you thinking of when he was dismissed from the dispatcher position, or what are you relying on specifically? Well, Your Honor, I'm relying on both that. He was in the 90-day probationary period. He was terminated because of his bad hearing. That was his testimony under oath in his deposition. Doesn't he say he thinks that it? I thought they cited a different reason, that the job was just too complex for him. Right, and that's why there is a genuine issue of material fact here, because Sheriff Standard said, well, I think the testified he was terminated because of his bad hearing. But I'm asking you, is that his perception, or did anybody tell him? We'll see cases where somebody says, you know, I didn't get the promotion, I wasn't hired, I was fired because of X protected characteristic, because of my sex, because of my religion, because of my race, you know, whatever it may be. And I want to know, was there any evidence other than his subjective perception that he didn't make it past the probationary period for that dispatcher job because of his impaired hearing? I think that the testimony came directly from Officer Vergette, where he testified he was terminated because of his hearing. Okay, that's fine. He said he wasn't cutting the grade, and it was because of his hearing. And then he went on to tell us that when he was rehired, that Sheriff Standard knew of his hearing loss because he was involved in his termination as a dispatcher. In addition to that, there was evidence in the record, in the medical record, that his hearing loss had a negative impact on his ability to do ordinary activities of times and often had to turn his ear, his good ear, to the speaker to be able to comprehend and understand things. Does this get illustrated by any incidents at the jail itself? You know, are there other instances in which inmates were trying to talk to him and he couldn't hear them or instances in which his co-workers were frustrated? I'm not aware of any of that being in the record, Your Honor. And of course, you know, there may have been occasions where that happened. He just didn't hear, like this situation, and so he doesn't know what he didn't hear. I think that you had asked another question, too. I was asking about Officer Williams. I mean, just other people whose hearing apparently is fine, who don't hear Kemp calling out for help during this second fight that he gets involved in. Right. And the difference in that, Your Honor, is that it's our contention that Officer Burgett was directly adjacent to G Block at the time the first assault happened. And furthermore, there was evidence... But are we focusing on the first assault or the second assault? The first one is kind of over and done. Kemp starts cleaning up after it. I thought it was the second one where he's beat so severely that he needs hospital help. And that's correct, Your Honor. But the argument that we're making is that had Officer Burgett, who there is evidence, was standing within 10 or 15 feet of G Block in the adjacent booking room area, if he had been wearing the hearing aid that he was prescribed, that he stopped wearing six months earlier, that he would have been able to hear Kemp's cries for help. And there was plenty of testimony from other corrections officers indicating that they could hear people yelling for help in the booking room hallway during their normal course of business. During the day, they could hear. But that's why I asked you whether the record shows how good his hearing was as corrected with this. Was he not wearing it because he thought it looked ugly? Was he not wearing it because it was pointless? Is there some other reason? He testified that he was not wearing it because he thought it was uncomfortable. That was his testimony. He did not say that it wasn't helping. So are you saying that the record establishes conclusively, sorry, that he was not wearing his hearing aid on that day? Or is it simply unknown since he said he couldn't remember? I believe that it's more probably true than not that he was not wearing his hearing aid based on his testimony. You're right that he at one point said he couldn't remember. But he also testified that he only wore it for approximately one year and then stopped wearing it. He was prescribed the hearing aid in March of 2015. And this happened in September of 2016. So I believe based on his own testimony that he stopped wearing the hearing aid sometime in March or April of 2016, five or six months before this incident occurred. So that was the issues and we've kind of touched on them. The district court had indicated that we had made an unsubstantiated claim that he was fired from his position due to his impaired hearing. They seem to just take officer standards testimony and not consider corrections officer Burgett's testimony on the same issue where he testified very clearly he was fired due to his hearing. And that is one of the genuine issues of material fact that we believe precluded summary judgment. On another issue, the court indicated that they weren't sure where he was located at the time of the attack, the first attack, and that he wasn't sure whether he had stopped to talk to the suicidal inmate in the small booking room or not the small booking room, the small holding cell. He actually testified, Burgett testified that it was more probably true than not that he stopped after he rounded G block, that he stopped and spoke to that needy inmate for anywhere between 10 to 15 minutes after he rounded on G block right before the fight. So that pleased him right in that area. And it would have been nice if the Fulton County Jail had preserved all of the videos that were in there. There were videos in every angle and that would have told us where he was located. However, they didn't see fit to do that and they allowed all of those videos to be deleted. So what we have to go on are the G block, the rounding logs, which show that he went to G block and approximately two minutes later, he was in the small holding cell. And then his own testimony that it's more probably true than not that he remained there for 10 to 15 minutes talking to that inmate without his hearing aid in. Counselor, your time's about expired. Judge Roeder, do you have a question? I do. You said on page 24 of your brief, quote, there is no published opinion in the United States with this fact pattern that can be cited to as precedent. That sounds a bit like a concession that defendants are entitled to qualified immunity, doesn't it? Oh, your honor, quite to the contrary. The reason why I pointed that out was because there is no case that fits this bill. And as you know, we have to look at each case on its merits and with the facts and circumstances of each case. There is no case reported anywhere in the United States where a sheriff or a department of corrections allowed a corrections officer to be employed and to function with significant hearing loss where he was prescribed a hearing aid and didn't wear his hearing aid. It just, it isn't there. And I think that's because the risk is obvious in allowing a corrections officer with bad hearing to make sure that the inmates and other officers are safe. You don't want to do that and put everybody at risk. Thank you. Mr. Rodia. Good morning and may it please the court. I represent the appellees in this matter. And let me start with the issue that counsel raised, which is officer Burgett's partial hearing loss. And the court had questions for him on that point. The problem with plaintiff's argument is that it is based on speculation because it starts with a conclusion, but there's no competent evidence that actually supports that or explains that. So counsel relies on medical records. If the court looks at those medical records, there are some objective findings. There's mention of certain frequencies where his hearing is normal, certain frequencies where it's abnormal, but on this record without any expert or any medical hearing expert who can testify and explain what these findings mean, it's really unsupported to say that, you know, just to say he had hearing loss, what does that mean? The medical records indicate that the officer said that he had difficulty sometimes hearing someone speak so that he would turn his right ear to the speaker. But in this case, we're talking about a fight and we're talking about noises and yelling and loud noises. There's nothing in this medical record without an expert to tell us conclusively that he couldn't hear loud noises. So it's speculative on that point. Now, we don't even know how loud the noises were on that day. What we do know is that a minute or so before the first fight starts, officer Burgett does his round, plaintiff speaks to him. There's absolutely no contention that Burgett couldn't hear a plaintiff speak to what plaintiff was telling him. So it's all speculative and it's unfortunate that an officer who forthright was forthright admitted that he had partial hearing loss to somehow take that and to make it as if he would have heard but for the hearing loss is unsupported. Now, let's counsel said that without what was hearing loss because officer Burgett was placed at the small holding cell area, he would have heard it. No one who was in that area was even interviewed, let alone deposed in this case. For example, the very inmate who Burgett allegedly spent a few minutes talking to at the small holding area, was he interviewed? Was he asked whether he could hear the noises from the fight? No, we don't have any evidence on that. There were other inmates in that other blocks in that area. No, we have no testimony, no evidence that anybody else heard it. As the court pointed out, the other officers, there were one other officer, Williams, two dispatchers. They didn't hear it. In fact, Williams testified that the second fight when she was doing her rounds, she reached H block, which is adjacent to G before she heard a stomping sound. So Williams couldn't hear it until she was which the district court below explained in its summary judgment opinion. And that map, you can see that there are two, there's two hallways and a row of offices that separates the G block where plaintiff was in the fight occurred from the small holding area. There's unrebutted testimony that near that small holding area, there was a kitchen and a laundry. When the laundry was on, sometimes you couldn't hear what was going on. So counsel saying that people could hear what was happening on other times in that area is not really supportive. Uh, we also know that Mr. Kim started the first fight, failed to actually tell officer Burgett when they spoke a minute before that first fight about the threat that very, uh, day from the other inmate doesn't tell the officer that then he instigates, he starts the first fight, throws the first punch, things cool down. Injuries seem to have been minor. In fact, they were busy cleaning up. You can see it's consistent with them not wanting to make too much noise. Then he instigates the second fight. He concedes to all this. And the court asked about qualified immunity when the 14th amendment was not designed to impose strict liability on a jail to stop any fight at any time. Now here we have a case that is actually against the grain of what we see in usual cases where it's the plaintiff who's the victim and he's not the aggressor and other people have threatened him in the past. Jail officers knew about it or should have known, and then they don't do anything to stop. So are you arguing that Kim's role in the two fights preclude him from taking relief? Judge, our position is that he cannot prove proximate cause. Uh, it's not that anything the officers did or didn't do caused his injuries. He voluntarily did what caused his injuries. And on those facts, but could I just interrupt and say, I mean, I thought you might be arguing that, but in jails, no matter who instigates a fight, once it's underway, if people are calling for help, the correctional officers are going to break up that fight. Then they'll worry about who needs to be disciplined or who needs to be put in segregation or who needs some form of measure after order is restored, but they don't just have a, well, you started it, so let's just watch other people pummel you, uh, approach. You're right, Judge, and that was not my argument. My argument was that even after the first fight stopped, the issue about whether Officer Burgett heard the first fight and was in the right place at the right time. Yes, that's a separate issue. What I'm saying is even after the first fight stopped, when everything was calmed down, it's Kemp who started the second one. And that's where our thrust in the argument is on that. And there's no, there's no contention that at that second fight, anybody actively knew it was happening. So are you saying that the second fight wasn't foreseeable to Officer Burgett? It wasn't foreseeable. And to go back to what the court asked counsel, yes, there was absolutely no notice to anyone in the jail. Kemp himself concedes he was in that cell with alleged gang members for six months. And besides for that one disagreement towards the end a week before on who would get a vacant cell, there's absolutely no issues with them. And we haven't seen any cases where a failure to protect claim survives if there was no notice. So even if the officer was negligent in not wearing his hearing aid on that day, an issue by the way, which is not conclusively proved as counsel said, the officer didn't know when he started and didn't know when he stopped wearing his hearing aid. And he says he didn't know if he was wearing it that day. But here's the question. Suppose, just for the sake of argument, I know this isn't your position, but suppose for the sake of argument, if he wasn't wearing his hearing aid in the actual situation, the fight lasted, I'll say five minutes. But if he had been wearing his hearing aid, he would have been in a position to break it up after minute two. So injuries were much worse because of the length of the fight. What about that as a theory? That is a plausible theory, but the facts undercut it in this way. If you look at the testimony surrounding where Burgett was after he finished rounding G, H, I, he then goes back to the small and the large holding cells. He testified that he was asked, what did you do after you did the small holding cell? And he said, most likely he would have gone to the kitchen, fix some tea or gone to the laundry room. And then he's asked, what would he do after that? Well, after that, I may have spoken to this inmate. So if we look at the there in that spot when the fight breaks out, and the other point is that after he finishes that, he was headed towards the back of the jail. There's also evidence that it's not clear that from back there, you can hear everything that goes on because the TVs are on. It was about, this time was around eight o'clock at night. We know for a fact from the video and from Kemp's testimony that the TV in their block was on. We also know that inmates are allowed to control the volume. So the facts undercut the theory that he would have heard it. And then yes, if he would have heard it, sure. Then the officer has a duty to immediately respond. But the facts here are too speculative to even get us to that point where we have. Now, if you look at the case, your time has expired. Thank you. Thank you. Thanks to Mr. Sustain. You have any time left? I can't hear you. You're muted. I believe I have five minutes. I think your time expired actually, but it would be up to Judge Caney if you have anything else. I think it had to, but I'll give you a minute. You have a minute. I just want to point out that Bergot testified that he always had to talk down the needy inmate, the suicidal inmate. He said, every time I did a round, I had to talk him down. And every time it would be 10 to 15 minutes. And he testified unequivocally. It was more probably true than not that on that round during that beating, he was talking to that inmate. So there is absolute evidence about that. Also, I'd point out that there was a doorway between the booking room and cell block G. And the testimony was that was normally kept open, which means that he was in the best position of all of the persons there to be able to hear this because he was literally 10 to 15 feet away with likely an open door between him and cell block G. And it's our contention that but for the not wearing his hearing aid, he would have heard it. There's also no evidence that there was any laundry being done at the time and no evidence anyone was in the kitchen. So there's no evidence of any other sounds going on at that time. I can ask. Yeah, thank you. I'm wondering what, how Mr. radio would have finished his last thought? Well, if I'm allowed to, yes, I would like to briefly rebut those points. Number one, no, the testimony did not conclusively establish that that hallway, the door, the booking was open. I think the court can look at the, the deposition transcripts and forget may have been there. See, again, he didn't know if you look at the transcript, he says, I don't know if I spoke to him, but he does mention one thing he tells counsel in the deposition. He said, if you look at the earlier rounds that day, it took me 40 minutes. I was late in my rounds because I had to deal with this needy inmate here. If we look at the cell check rounds, which is what counsel is relying a lot on. Well, that same document says he scanned the large holding cells seconds after the first one. So it could well be that after he goes to the laundry kitchen, he comes back and talks to the media and made, I'm not saying that that didn't happen, but then that would have been a time when the fight was already over. So it's just too much speculation based on the kind of testimony counsel is relying on. Thank you. Thank you. All counsel and the case is taken under advisement and thanks for being here. Thank you.